***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission adopts the Opinion and Award of Deputy Commissioner Ledford with minor modifications.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. At the time of the alleged injury, which is the subject of this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. Defendant employed three or more employees at the time of the alleged injury. The employee-employer relationship existed between plaintiff and defendant.
3. Plaintiff's average weekly wage is $494.12.
4. Plaintiff's date of hire by defendant was May 5, 2003.
5. The date of alleged injury was February 26, 2005.
6. The injury concerns plaintiff's left shoulder.
7. The parties further agreed to stipulate into evidence a packet of plaintiff's medical records, marked as Stipulated Exhibit 1, and plaintiff's May 6, 2005 recorded statement, marked as Stipulated Exhibit 2.
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff was born on December 31, 1944 and was 60 years of age at the time of the alleged injury. Plaintiff was employed by defendant from May 5, 2003 until his last date of actual employment on Saturday, February 26, 2005. Prior to going to work for the defendant, plaintiff had operated heavy equipment, such as a front-end loader in the 1970's and 1980's. After that he worked primarily as a carpenter and construction supervisor. Plaintiff knows how to read blueprints and order materials. From 1995 through 1997, plaintiff was a supervising carpenter for a company building forms for pouring concrete. Plaintiff has been assessed as totally disabled by the Social Security Administration and is currently receiving Social Security Disability benefits. *Page 3 
2. In February 2005, plaintiff was employed by defendant as a Lead Laborer I, driving a flush truck that is used to maintain defendant's sewer collection system. The flush truck that plaintiff was operating held 1,500 gallons of water and carried a hose reel that sits on a circular platform on the front of the truck. The hose reel operates hydraulically to unwind into the sewer so the sewage lines can be cleaned out. The flush truck is driven to a man hole on the street, and the hose reel platform is manually turned at least twice at each manhole, and twice when the truck is refilled with water.
3. The flush trucks are manned by two employees: the Lead Laborer I, who drives the truck, positions it over the manholes and then engages the truck's hydraulics by toggle switches and a lever, and the Laborer, who pulls the hose reel apparatus away from the truck and tells the driver where to position the truck. After the hose is deployed into the sewer, the Lead Laborer I must stay with the truck to operate the switches and to make sure that the truck does not roll away.
4. About five months prior to February 2005, the hose reel on the front of the flush truck driven by plaintiff became difficult to turn, and plaintiff needed to get out of the truck and assist his laborer. Plaintiff reported this to Thomas Johnson, Assistant Sewer Superintendent for the defendant, who told him to take the truck to defendant's garage for repairs. The truck was in the defendant's garage for repairs on October 18, 2004 and again on February 1, 2005. Defendant's mechanic, A. J. Garrett, at that time determined that the ball bearings were bad, and the parts were ordered. However, the truck was not repaired until May 2005, after plaintiff had left his employment with defendant.
5. On Friday afternoon, February 25, 2005, there was a sewage spill on Wallingford Drive in Raleigh. Plaintiff and his assistant, Warrie Evans, worked on cleaning the spill until *Page 4 
8:00 p.m. A spill occurs when the line clogs up and sewage comes up through the top of the manhole and starts leaking onto the street.
6. Plaintiff and 12 to 15 other laborers went back to work on the Wallingford spill on Saturday morning, February 26, 2005. Mr. Evans did not work on Saturday, and no one else was assigned to assist plaintiff due to defendant's scheduling of a lesser number of employees on Saturday. Plaintiff had to turn the reel platform entirely by himself. On Saturday, February 26, 2005 plaintiff turned the reel platform approximately 14-20 times. It was difficult to turn due to the bad ball bearings. This was the first time plaintiff had to turn the reel platform by himself.
7. John Helms, an employee for defendant, saw plaintiff at the work site on Saturday. Plaintiff told Mr. Helms that the reel assembly was stiff to turn and plaintiff complained to him that his shoulder was bothering him that day. Plaintiff went home after work and stayed at his house until Monday morning. While at home, nothing unusual happened to plaintiff's shoulder other than developing pain.
8. On Monday, February 28, 2005, plaintiff awoke around 2:00 a.m. with excruciating pain in his left shoulder. Plaintiff's wife helped him dress and later he reported to work. Plaintiff told Mr. Johnson, the sewer superintendent that his shoulder was hurting, but he was not sure what he did to it. Plaintiff told Mr. Johnson he was going to see a specialist to get his shoulder checked out for bursitis
9. On February 28, 2005, plaintiff was seen by Dr. Mask at Raleigh Urgent Care. Plaintiff gave Dr. Mask a history of having been awakened early that morning with the sudden onset of left shoulder pain. Plaintiff did not give Dr. Mask a history of a specific injury at work at that time. Dr. Mask ordered x-rays and referred plaintiff to Dr. Kevin Speer, an orthopedic surgeon who specializes in shoulder injuries. *Page 5 
10. On March 8, 2005, Dr. Speer examined plaintiff. Plaintiff was in severe pain and was taking narcotic pain medicines. Dr. Speer reviewed the x-rays, which revealed a massive rotator cuff tendon tear, which had been present for some time. Upon examination, Dr. Speer found that plaintiff had limited range of motion and weakness and tenderness in the left shoulder. Plaintiff did not recall any major singular event to his shoulder, but he did think it might be work related. Due to the severity of plaintiff's injury, Dr. Speer knew there was no simple treatment. Plaintiff first tried steroid injections, along with physical therapy.
11. On March 8, 2005, Dr. Speer wrote plaintiff out of work. Plaintiff tried to apply for short-term disability benefits through defendant, but learned that he was not eligible. Plaintiff then pursued his injury as a work-related injury having occurred on the last day he worked for defendant.
12. Cortisone shots and physical therapy were ultimately unsuccessful. On July 25, 2005, Dr. Speer performed arthroscopic surgery to clean out the joint, remove bone spurs and remove loose tendon edges. During the course of performing the surgery, Dr. Speer found grade 2 and 3 chondral changes throughout the humeral head, indicative of significant chronic changes. Dr. Speer also noted that the biceps tendon was hypertrophic and plastered to the anterior subscapularis, a very dramatic finding indicative of a problem that did not develop within a short period of months. The supraspinatus and infraspinatus were entirely torn and gone, and the rotator cuff tendons were not reparable. Dr. Speer testified that ultimately plaintiff would need a complete joint replacement (arthroplasty).
13. After plaintiff's July 25, 2005 arthroscopic surgery, plaintiff participated in a course of physical therapy, and by September 2005 was able to flex the left shoulder to 100 *Page 6 
degrees and abduct the left shoulder to 95 degrees. When plaintiff returned to Dr. Speer in January 2006, Dr. Speer noted that plaintiff was doing reasonably well.
14. Dr. Speer testified that plaintiff has a very high pain tolerance. Plaintiff's July 25, 2005 surgery revealed that plaintiff was working with a chronic shoulder condition that most likely developed more than a year prior. Dr. Speer also testified that plaintiff most likely had torn rotator cuff tendons in his shoulder at the time he first started working for defendant. However, plaintiff continued working with few complaints of pain. Dr. Speer indicated that about ninety-five percent of patients would find plaintiff's condition very painful.
15. Dr. Speer testified that although plaintiff's shoulder condition pre-existed plaintiff's employment with defendant, plaintiff's duties of employment with defendant exacerbated plaintiff's shoulder to the point that his pain and shoulder condition became disabling. In particular, turning the hose reel on the flush truck with the bad ball bearings caused additional stress and injury to plaintiff's left shoulder.
16. Anything involving heavy lifting, pushing, pulling with the arms or front of the body or arms over head would put plaintiff's shoulder at risk. Based on plaintiff's reports to Dr. Speer, Dr. Speer testified that it appeared that plaintiff's job duties had a significant role in the development of his pain, and that the physicality of plaintiff's job placed him at an increased risk of developing rotator cuff pathology beyond someone who did not have that job.
17. As of April 4, 2006, without a complete shoulder replacement, plaintiff would be considered at maximum medical improvement. Dr. Speer assigned plaintiff restrictions for his left shoulder of no repetitive over-head activities, no climbing, no ladders, and a ten (10) pound lifting restriction with both hands, five (5) pounds lifting with the left hand only. *Page 7 
18. With a joint replacement, plaintiff may be able to return to work, in a more restricted capacity, depending on how well he tolerates the surgical procedure. Dr. Speer testified that plaintiff would not be able to return to his prior job operating the flush truck for defendant even after the joint replacement.
19. Defendants requested an independent medical records review by Dr. Almekinders, an orthopedic surgeon who teaches at Duke and specializes in treatment of the shoulder and knee. Dr. Almekinders reviewed plaintiff's medical records, and the testimony that was offered at the hearing and by Dr. Speer. According to Dr. Almekinders, plaintiff suffered from a chronic condition that developed over years. Dr. Almekinders indicated that if plaintiff's injury had happened acutely on the job, it would have been extremely painful the moment it happened. Dr. Almekinders opined that once the rotator cuff tear is so large that the humeral head rides through the tear and hits the acromium, it is just a matter of time even under basically normal use for plaintiff's condition to cause rotator cuff arthropathy and arthritis.
20. The undersigned have considered the testimony of both Dr. Speer and Dr. Almekinders and have given greater weight to the testimony of Dr. Speer as plaintiff's treating physician.
21. Plaintiff's counsel retained Stephen Carpenter of Carpenter Rehabilitation Services to conduct a vocational evaluation of plaintiff. Mr. Carpenter reviewed plaintiff's medical records and met with plaintiff, to determine his education and work experience and to assess any transferable skills. Considering plaintiff's history of medium to heavy labor, his limited high school education, and the significant restrictions on his left shoulder, Mr. Carpenter found that plaintiff is not employable. *Page 8 
22. Dr. Speer and Mr. Carpenter testified that plaintiff is not currently employable in the competitive marketplace, based on plaintiff's age, education, training, and physical restrictions. Considering all these factors, without the shoulder arthroplasty, attempts at vocational placement at this time would be futile.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Based upon the greater weight of the evidence, on February 26, 2005, plaintiff developed a complete rotator cuff tear and osteoarthritis in his left shoulder due to unusual conditions in his employment with defendant. Plaintiff was under additional stress to his left shoulder due to plaintiff's operating a hose reel with bad bearings. This was an interruption of plaintiff's normal work routine, and an accident within the meaning of the Workers' Compensation Act. N.C. Gen. Stat. § 97-2(6).
2. The medical treatment rendered to plaintiff by Dr. Mask and Dr. Speer was reasonably necessary to effect a cure or provide relief. Defendants shall be responsible for future medical treatment of plaintiff's left shoulder, including the shoulder replacement at such time as that surgery may be performed. N.C. Gen. Stat. §§ 97-2(19), 97-25.
3. As a consequence of plaintiff's February 26, 2005 accident, plaintiff's pre-existing, but non-disabling condition in his left shoulder was aggravated and accelerated, to the point that plaintiff developed a complete rotator cuff tear, significantly impairing his ability to use his left shoulder and arm. N.C. Gen. Stat. § 97-2(6),Holley v. ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750 (2003). *Page 9 
4. As a consequence of plaintiff's work-related injury, and considering plaintiff's age, education, and work experience, plaintiff has been unable to earn wages in the same or any other employment since February 28, 2005. As a result, plaintiff is entitled to temporary total disability benefits from February 28, 2005. N.C. Gen. Stat. § 97-29.
5. Plaintiff's average weekly average weekly wage of $494.12 yields a compensation rate of $329.43. N.C. Gen. Stat. § 97-2(5).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff for treatment of his left shoulder injury due to plaintiff's February 26, 2005 compensable injury.
2. Defendants shall pay plaintiff compensation at the rate of $329.43 per week as temporary total disability benefits beginning February 28, 2005 and continuing until further order of the Commission. All accrued benefits shall be paid in a lump sum, subject to the attorney's fee.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff is approved for plaintiff's counsel of record. Twenty-five percent of the lump sum due plaintiff shall be paid to his attorney. Thereafter, every fourth check shall be paid to Plaintiff's counsel.
Defendants shall pay the costs.
 This the 14th day of November 2007. *Page 10 
S/___________________ BUCK LATTIMORE COMMISSIONER
CONCURRING:
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 1